Case number 182013, United States v. Jara, Tanis, Cotto-Flores. Good morning, Your Honors. May I please see the Court? I am Counselor Luis Rafael Rivera on behalf of Mrs. Jara Cotto-Flores. This is a case dealing very closely to the issues that you were discussing on the previous case. The application of Section 2423 of the 18 U.S. Code essentially is the applicability of Magdalena Burgo's decision issued by Your Honors a couple of years ago on the matter of Section 2421. Although that section deals with the transportation of people generally for the purpose of engaging in prostitution or other indecent acts, and it was part of the Mann Act that was enacted in 1910, it is still the law that is applied to this district and this country, and it's specific to you that this case is the one that should be dealt with and encompassed within the purview of your decision in Magdalena Burgos. This is the story of the prosecution of a lady who was a schoolteacher, 26-year-old Mrs. Cotto-Flores, was a schoolteacher here in Puerto Rico, and the allegations were that she transported a 14-year-old minor from her school area to a nearby motel. The transportation encompassed only about a mile, mile and a half, from that school, and still the Federal District U.S. Attorney's Office decided to prosecute this case under 2423. We submit to you and hearing the previous discussions from your honors and previous counsels that this Section 2423 is applicable to states. Puerto Rico has been treated in the past like a state. Some of you have discussed the application of these statutes to Puerto Rico as a state in Cordoba. This case is a 1981 case, and I think that the purview of this case should be encompassed within Cordoba. Once you apply Cordoba and the decisions that rely therein, Cordoba stays at Puerto Rico. In that case, it was related to the Sherman Act that Puerto Rico is treated by Congress for many purposes after the Federal Relations Act of 1952, like a state. And that being the situation, that being the case that governs this circuit, I believe that when you apply Maldonado-Burgos to Mrs. Coto-Flores' case, that conviction cannot stand under Section 2423. I have other issues that may be discussed before this Court. Those are the Sixth Amendment violation right to Mrs. Coto-Flores relating to the use of closed-circuit TV when the minor specifically stated that he is a person that did not particularly fear Mrs. Coto and Judge Dominguez allowed that minor of 16-year-olds at that time to testify on CCTV. How old was he? He was 16 at the time that he testified, and if I recall correctly, he was 5'10 and 165 pounds. He was an excellent baseball player who has been contemplated to play in the major leagues. What league did he play in at the time? Is that in the record? I'm sorry, Your Honor? Is it in the record what baseball league he played in at the time? I can't recall exactly. It was probably AA, but— Well, probably is not good enough. No, no, no good enough, Your Honor. I understand. But I think he was playing—my belief is that he was playing baseball at a minor league level, and he was contemplated for major league baseball recruitment, but he didn't have the age. Is that in the record? Yes, Your Honor. Well, whatever league he was in, I think you say in the brief that he was doing a lot of traveling. He was—actually, he traveled 15 times for baseball academies and plays and games throughout a couple of years, and he was traveling alone. So he showed a lot of maturity and a lot of conscience, good conscience. When he was talking to the court, I personally didn't see any fear coming from him. Even his mother at the pre-sensitive board related that he did not fear the defendant. She was no longer a source of authority. Could you just clarify for me how the closed circuit option got brought up in the first place? I'm sorry. What's that, Your Honor? The closed circuit option. Yes. Who initiated that process? Because ordinarily the default position is that the person is going to testify unless there's reason to believe. Well, Your Honor, a couple of days before trial, the prosecution filed a motion for the use of closed caption TV. We opposed the same. It was disclosed during trial, and Judge Dominguez decided to have a separate hearing in chambers, and we discussed that matter for about an hour. What was the specific reason that the government played? They stated that this defendant feared her teacher, and he did not feel comfortable talking against her in open court. That was essentially the allegation by the prosecution. And during the hearing, he expressed that he felt nervousness, that he was uncomfortable, and he didn't feel well talking in front of Mrs. Cota-Flores. Although he stated that, on the other hand, he also said that he was healthy, that he was playing basketball, that he had a good relationship. Baseball or baseball? Well, baseball. I'm saying basketball. I'm sorry. It's baseball. And that he was feeling well on that specific day. But then he said, yes, I would rather not talk in front of Mrs. Cota-Flores. I think that the court clearly heard in establishing that he feared Mrs. Cota-Flores and that closed caption TV was required. That deprived us of the opportunity to have that witness in open court before the jury for them to examine his demeanor and his behavior. Did he testify before a grand jury? I don't think so, Your Honor. I think it was my best recollection is that it was an agent who testified before the grand jury, stating what he had told them. So he has indeed already talked to agents about this situation. It is good that the court asked that. Judge Thompson, it appears that during those interviews, he stated clearly that he didn't want to hurt Mrs. Cota-Flores, that he didn't fear her at that time, and that he did not want anything wrong to happen to her. So that tells you what was his feeling at the time that he was interviewed. And then a couple of months later, maybe a year later, he changes his stance and says before the court that he was somewhat fearful of testifying in front of Mrs. Cota-Flores. I should say also that this transportation on the 24-23 and the factual scenario that he testified before the court didn't include any threats, any coercion, any violence, any acts of aggression against this minor. So saying that he was fearful for her after saying that he didn't want anything wrong to happen to her and examining all the exchange on the WhatsApp application, you realize that he was in love with her teacher and that the conversations were romantical in nature, extensively romantical in nature. So saying that he was fearful at that time, I think didn't cut. And of course, you have not allowed that to go through CCTV. You mentioned that there was a computer glitch when this was going on? A computer glitch? That's what you said in your brief and a footnote, that at some point either the picture cut out or the volume cut out, something cut out, you said. Yes, Your Honor. At that certain point when we were trying the case on the CCTV monitor for the jury, the witness could not be seen testifying. And how long did that go on? Could have been about a minute. That's all? Yes. Could have been close to a minute to the best of my recollection. I'm sorry, just one more thing. So did it automatically fix itself or did the testimony have to be interrupted so that the equipment could be? Yes, Your Honor. One of the counsels, Rivera Fernandez, realized what was happening and we alerted the court and it was correct. It was correct. Maybe two minutes, but that's the most I can remember. That's essentially the gist of arguments. Just one more question. Yes, Your Honor. At the point when it was realized that something had been missed, did the prosecution re-ask the questions? No, Your Honor. No, they did not. So there was a little bit of confrontation, even indirectly, that was missing there. Yes, Your Honor, definitely it was. Okay, thank you. What do you mean to stop your argument? Is it done? I don't know. Good morning again, Your Honors. For the record, Julia Maconiatis for the United States. So is Puerto Rico the only place where this is prosecuted within the territories? Your Honor, I do not have that knowledge. I do know that that secondary type of transportation is only available in commonwealths, territories, or possession, which would be constitutional territories. I do not know if in the other constitutional territories the statute is utilized for that type of. I mean, by your office, that's what I'm wondering. Is the U.S. attorney prosecuted elsewhere besides Puerto Rico? Is the statute used elsewhere besides Puerto Rico? It's your office. I don't mean the U.S. attorney. Does the U.S. attorney prosecute man act violations like the one before the court in the other territories? To my knowledge, no, Your Honor. Why? Well, it would have to be, I would think, that the office that prosecutes it would have to be where the transportation occurs. So, for example, if there were interstate transportation from Maine to New Hampshire, it would be Maine to New Hampshire. I'm talking about like the Virgin Islands. Is the man act prosecuted in the Virgin Islands with acts solely occurring, not across state lines or territorial lines, but solely within the territory of the Virgin Islands? Your Honor, I do not know that answer. Why? Well, we can try to check through PACER and see, and if Your Honor would like a 28-day letter to that effect, we have no problem in doing so. But I am privy to what our office has done, and our office has used that due to the plain language of the statute. And just to make a couple of additional points, so as not to rehash the previous argument, but it's the government's contention that the 1998 amendment that includes the word Commonwealth serves as specific evidence, specific evidence of Congress's intent that travel within Puerto Rico be part of the man acts protection. And there's been two cases. I'm sorry, so prior, and I don't want you to have to repeat everything, so I'm just trying to follow up. And so prior counsel's research, according to her, suggested that it was only around 2000 that these kinds of prosecutions started occurring in Puerto Rico. Do you know if that's true or not? To the best of my recollection, it has been within the 2000s. I'm not aware of any case prior to that. And is that specifically because of the addition of the word Commonwealth? That I could not say, Your Honor. It would be speculation on my part, and I do not want to do that on the record. Is Maldonado-Burgos of any relevance to this case? Your Honor, to the extent that Maldonado-Burgos is a question of statutory interpretation, I would say yes. And the way that they frame the issue in that case, I would say yes, because the issue is whether the Mann Acts framers, aware of Puerto Rico's new status, would want its continued coverage. But Maldonado-Burgos also did something else. It required when there is no, where the act itself is silent, either clear policy reasons or specific evidence that Congress would continue, would want this transportation within Puerto Rico to continue to fall under the Mann Acts purview. And it's precisely what the government is saying, that here we have that specific evidence. We have the 1998 Protect Act. The inclusion of Commonwealth to that territory or possession clause means a Commonwealth that's not a state. The only commonwealths that aren't states would be the Commonwealth of Puerto Rico or the Commonwealth of the Northern Mariana Islands. This passed unopposed. It's arguably not a substantive change, but a clarifying change. It didn't expand anything that what Congress at that time thought was going on. CRESPO at that time had been good law for 70 years. Congress didn't change a thing. Now Congress's silence is that it suggests the continued validity of a judicial rule. It's this court in Maldonado-Burgos that said, well, after Law 600, we can't see anything on the record that shows Congress would want 2421 to continue in Puerto Rico. Well, this is where this case is different because we do have the Protect Act. And there's two other cases that arguably aren't on all fours but that also support this conclusion. In United States v. Mercado Flores, which was a case that started out as 2423A but then was down-pledged to 2421 as a plea negotiation, the court noted in that opinion that 2423A was not susceptible to the same conditions at the district court in 2421 because 2423A has the word commonwealth. Likewise, in United States v. Fernando, when this court was examining Section 666, which is the theft or bribery of federal programs, when examining the definition of the word state, which includes, and in 666, it includes commonwealth, territory, or possession to determine whether the statute is applicable, the court had no problem concluding that Puerto Rico fell squarely within the definition. It's clearly not a state. It's clearly not the District of Columbia, but it fell within the definition of commonwealth, territory, or possession. Can we change the subject slightly? Yes, Your Honor. Why did the government ask to have this witness testify in not the usual fashion? Yes, Your Honor. Prior to trial, the government. Can you answer that question? Because of the witness's fear. His fear. Yes. This was expressed to the government. This was in the government's motion requesting the closed circuit testimony. And I take it that you say that the witness told you he was afraid of what? Well, Your Honor, I do not know the conversation that was privy to the witness and the process provides two avenues which a court can determine closed circuit testimony is necessary. The first is if the minor fears the defendant. And the second. Let's stop there. Sure. So did the minor fear this defendant? Your Honor, in the context of face-to-face confrontation in the courtroom, the record supports that finding. All right. Let's stop there because I want to ask you some questions. Yes, Your Honor. As I understand it, he gave a statement to the Department of Education in March of 2016. Am I correct? Yes, Your Honor. And he says that he did not, quote, he did not feel afraid of Mrs. Corto. That was in March 2016. Yes, Your Honor. Thank you. In that trial, the court asked the minor whether, in fact, hold on a second. Yes. He asked Mrs. Corto whether he was afraid of, whether Mrs. Corto would bring fear to him, to which the minor responded yes. Yes, Your Honor. So far am I right? Yes, Your Honor. And defense counsel asked the minor to explain what type of fear he felt, to which he responded, I don't want to see her because I don't feel good when I see her. I don't want to see her. Am I correct? Yes, Your Honor. The government asked her then, do you fear her looking at you, to which he responded, not necessarily. Am I correct? Yes, Your Honor. Today, sorry, defense counsel then asked, and today you don't feel any fear of her either, to which the minor responded, I am not afraid, but I do feel uncomfortable when I see her. Your Honor, that iteration of the question, are you afraid in the in-chambers conference, was asked multiple occasions also using multiple synonyms by the district court who was trying to get to the root of the inquiry, because the root of the inquiry, whether to allow closed circuit television, is whether there is a real legitimate fear, and not just in an ease of being in the courtroom. It sounds to me like it was mere nervousness rather than fear. The district court went beyond that in its explaining. There is a substantial in-chambers conference where the minor not only said that he was nervous and uncomfortable, but there was more. He said that it would cause him distress. It would make him agitated, that he would have fear of her standing there. He recognized, now this is important, that it didn't pose a physical threat. But nonetheless, his physical reactions showed that this was more than just general uncomfortableness. Now the district court. Is this a six-foot young fellow afraid of seeing a woman whom he had been intimate with? Well, Your Honor, we need to take, he may be a six-foot young fellow, but he's a minor. He's a 16-year-old minor that when he was 14 years of age was honestly taken advantage by by a person of trust, by his teacher. And at this point he explained, and the court made vivid findings on the record, that his heart raced. He had chest pains. He put his hands to his chest when he was discussing how he was feeling. He said that he was getting hot, that he was flushed. Now the court observed these reactions by the defendant, and that observation is afforded due deference. It's hard to distinguish this display of anxiety from the anxiety that most witnesses feel when they have to testify in open court. Well, Your Honor, this is why the district court, who was able to see him, who was able to ask him the same question in different iterations, he had that benefit of face-to-face with the defendant. He found the findings that he had are supported by the record, and this choice between conflicting plausible interpretations cannot be clear error. Now getting back to what Judge Torruella says, his physical aspect, I believe, misses the mark here. How big an individual is has nothing to do with their mental state. I also submit to the court that that's irrelevant also. Your success on the baseball field and your ability to get on a plane and travel to do something that you are comfortable with and is very different from being in a court of law two years later, seeing the individual that maybe now you have more of an understanding that abused you. Similarly, his statements by his mother to show... Do you happen to know what league he played in? I do not, Your Honor. I do not. The statements by his mother also miss the mark. First of all, they were said to the probation officer after trial. And importantly, it's not what the mother thinks. It's what the defendant feels. And the fact that the mother said he wasn't afraid of her, at that point he was never going to see her. The conditions of her bail prohibited Ms. Skolko from having interactions with this minor. Is there any kind of requirement that there needs to be some objectively reasonable fear? Well, Your Honor, what it states is that the minor, the statute itself just says fear. And the second part of the statute requires some sort of psychologist's evaluation, but the first thing, Congress clearly found that a minor's fear is sufficient. And what's important to note here is this is just one aspect of confrontation, the face-to-face confrontation. In this case, all other aspects of confrontation were safeguarded. The defendant was able to see the minor testify via closed circuit. And just to clarify what happened with the computer glitch, it wasn't. It was just for one moment when the government put on the ELMO, on the projector, a piece of paper. So at that time, when the government put something on the piece of paper, it projected the piece of paper as opposed to the camera. And right when it was brought to the court's attention that, hey, we can't see the defendant, there's no indication that the audio wasn't working, it was just that the video of the projector was trumping the video of the closed circuit television. And when that happened, the district court even instructed the government,  the jury will get to see it during deliberations. So the only part of confrontation here that was curtailed after a finding by the court as mandated by 3509 was the face-to-face. There was contemporaneous cross-examination. Yes? Can you just give me a little bit more as to how this Senate works? Can the witness see the defendant? Yes, Your Honor. It's two-way closed circuit, so it's a different room. And who's in the room with the jury? Is the witness in the room with the jury or the defendant? No, the defendant is in the room with the jury, and the prosecutor is also in the room. I think it is just the minor with an adult attendant that is in a secondary room that is being projected to the courtroom and vice versa. So if the minors want to see, just like they could in a regular courtroom, they could avert their eyes, but it's a two-circuit closed circuit television. And so through that, only that one point of face-to-face confrontation was curtailed in this case. Because there was contemporaneous objections, there was a lengthy cross-examination. Cotto had a full opportunity to cross-examine, which he took advantage of. This cross-examination was in approximately one hour. The minor testified under oath, and here we have the judge, jury, and Cotto were all able to see the minor and his appearance and his demeanor while he testified through the closed circuit. So even if at the end of the day this was an error, using the constitutional dimension of harmless beyond a reasonable doubt, because all of the other elements of confrontation were preserved, a new trial would not be warranted. I see that I've gone over my time. If there are no further questions, I thank the court. Thank you.